VIRGINIA:

**BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD**

IN THE MATTERS OF                          VSB DOCKET NOS. 24-033-132462
CHRISTOPHER CAMPBELL BOOBERG                              25-033-132527
                                                         25-033-133699
                                                         25-033-133953
                                                         25-033-133956

<u>**CONSENT TO REVOCATION ORDER**</u>

On, November 18, 2025, came Christopher Campbell Booberg ("Respondent") and presented to the Board an Affidavit Declaring Consent to Revocation (hereinafter "Affidavit") of his license to practice law in the courts of this Commonwealth. By tendering his Consent to Revocation at a time when a disciplinary complaint, Investigation or Proceeding is pending, the nature of which is specifically set forth in the attached Affidavit, the Respondent acknowledges that the material facts contained in the pending disciplinary complaint, Investigation or Proceeding are true.

The Board having considered the Affidavit, and Bar Counsel having no objection, the Board accepts his Consent to Revocation.

Upon consideration whereof, it is therefore ordered that Christopher Campbell Booberg's license to practice law in the courts of this Commonwealth be and the same hereby is revoked, and that the name of Christopher Campbell Booberg be stricken from the Roll of Attorneys of this Commonwealth.

It is further **ORDERED** that the Respondent must comply with the requirements of Part Six, Section IV, Paragraph 13-29 of the Rules of the Supreme Court of Virginia. The Respondent shall forthwith give notice by certified mail of the Revocation of his license to practice law in the Commonwealth of Virginia, to all clients for whom he is currently handling matters and to all opposing Attorneys and presiding Judges in pending litigation. The Respondent shall also make

appropriate arrangements for the disposition of matters then in his care in conformity with the wishes of his clients. The Respondent shall give such notice immediately and in no event later than fourteen (14) days of the effective date of the Revocation, and make such arrangements as are required herein as soon as is practicable and in no event later than forty-five (45) days of the effective date of the Revocation. The Respondent shall also furnish proof to the Clerk of the Disciplinary System of the Virginia State Bar within sixty (60) days of the effective date of the Revocation that such notices have been timely given, and such arrangements have been made for the disposition of matters.

It is further **ORDERED** that if the Respondent is not handling any client matters on the effective date of the Revocation, he shall submit an affidavit to that effect within sixty (60) days of the effective date of the Revocation to the Clerk at the Virginia State Bar. The Board shall decide all issues concerning the adequacy of the notice and arrangements required herein.  The burden of proof shall be on the Respondent to show compliance.

It is further **ORDERED** that pursuant to Part Six, Section IV, Paragraph 13-9.E, of the Rules of the Supreme Court of Virginia, the Clerk shall assess all costs against the Respondent.

It is further **ORDERED** that an attested copy of this Order be mailed by the Clerk to the Respondent by electronic, first-class, and certified mail, return receipt requested to his address of record with the Virginia State Bar, being BoobergLaw, P.C., 406 West Franklin Street, Richmond, VA 23220, and a copy by electronic mail to Paulo E. Franco, Jr., Respondent's Counsel and a copy by electronic mail to Shelley L. Spalding, Assistant Bar Counsel.

ENTERED THIS __**19th**__ DAY OF NOVEMBER, 2025

VIRGINIA STATE BAR DISCIPLINARY BOARD


_____/s/ Alison Martin_____

Alison G. M. Martin**,** 1st Vice Chair

**RECEIVED**

**NOV 1 8 2025**

**VSB CLERK'S OFFICE**

V I R G I N I A :

## BEFORE THE DISCIPLINARY BOARD OF THE
## VIRGINIA STATE BAR

IN THE MATTERS OF                      VSB Docket Nos.  25-033-132527;
CHRISTOPHER CAMPBELL BOOBERG           24-033-132462; 25-033-133953;
                                       25-033-133699; and 25-033-133956

### AFFIDAVIT DECLARING CONSENT TO REVOCATION

**COMES NOW** Respondent, Christopher Campbell Booberg, pursuant to Part 6, Section

IV, Paragraph 13-28 of the Rules of the Supreme Court of Virginia, and after being duly sworn

states as follows:

1.      I was admitted to the practice of law in the Commonwealth of Virginia in 1994.

2.      I submit this Affidavit as my Declaration of Consent to Revocation pursuant to

the Rules of the Supreme Court of Virginia.

3.      My consent to revocation is freely and voluntarily rendered. I am not being

subjected to coercion or duress, and counsel of my own choosing assisted me in preparing this

consent. I am fully aware of the implications of consenting to the revocation of my license to

practice law in the Commonwealth of Virginia.

4.      I am aware that there is currently pending against me allegations of Misconduct in

the Certification dated August 19, 20205 ("Certification"), the docket numbers of which are set

forth above, and which is currently set for hearing before the Disciplinary Board of the Virginia

State Bar on December 11-12, 2025. A copy of the Certification is attached as **Exhibit A**.

5.      I acknowledge that the material facts in the Certification upon which the

disciplinary proceedings are predicated are true.

6.    I submit this Consent to Revocation because I know that if a disciplinary proceeding based on the alleged conduct were brought or prosecuted to a conclusion, I could not successfully defend them.

I submit this Affidavit and hereby Consent to the Revocation of my license to practice law in the Commonwealth of Virginia Executed this _____ day of November 2025

_____
Christopher Campbell Booberg
Respondent

**COMMONWEALTH of VIRGINIA**
**CITY of Richmond to wit:**

The foregoing Affidavit Declaring Consent to Revocation was acknowledged, sworn, and subscribed to before me by Christopher Campbell Booberg on this 12th day of November 2025.

_____
**NOTARY PUBLIC**

**My Commission Expires:** _8/31/28_____

KATELYN VANBUREN
NOTARY PUBLIC
MY COMMISSION NUMBER
00338386
COMMONWEALTH OF VIRGINIA



# Virginia State Bar

THIRD DISTRICT, SECTION III COMMITTEE

PLEASE REPLY TO:
Joanne Fronfelter, Clerk
1111 East Main Street, Suite 700
Richmond, Virginia 23219-0026

August 19, 2025

PERSONAL AND CONFIDENTIAL

<u>VIA CERTIFIED MAIL, FIRST-CLASS MAIL & EMAIL</u>
Christopher Campbell Booberg
BoobergLaw, P.C.
406 West Franklin Street
Richmond, Virginia 23220
chris@booberglaw.com

**Certified Article Number**

9414 7266 9904 2248 6754 89

**SENDER'S RECORD**

Re:     In the Matter of Christopher Campbell Booberg
        VSB Docket Nos. 25-033-132527
                        24-033-132462
                        25-033-133953
                        25-033-133699
                        25-033-133956

Dear Mr. Booberg:

Enclosed is a copy of the Subcommittee Determination (Certification) in the referenced matter.

Pursuant to Part Six, Section IV, Paragraph 13-18.A of the Rules of the Supreme Court of Virginia, you have 21 days from the date of the Certificate of Service on the enclosed Certification to:

a.      file an Answer to the Certification with the Clerk of the Disciplinary System, or

b.      file an Answer to the Certification and a demand with the Clerk of the Disciplinary System, that further proceedings be conducted pursuant to Virginia Code Section 54.1-3935 and simultaneously provide available dates for the hearing to be scheduled not less than 30 nor more than 120 days from your demand.

Failure to file an Answer, or an Answer and a demand with available dates, within 21 days, constitutes consent to the Disciplinary Board's jurisdiction. In that event, the Board will set a date, time and place for the hearing and serve a Notice of Hearing upon you at least 21 days before the hearing date.



EXHIBIT

A

Sincerely,

Dennis Russell Kiker
Subcommittee Chair

Enclosure

cc:    Joanne Fronfelter, Clerk of the Disciplinary System
        Shelley Spalding, Assistant Bar Counsel
        Michael Schuler, Investigator
        Melissa Geigel, Complainant
        Jose Antonio Rodriguez, Complainant
        Laquita Everett, Complainant
        Jonathan Baldwin, Complainant
        Jennifer Parrish, Complainant
        Paulo Emilio Franco, Jr., Respondent's Counsel

VIRGINIA:

BEFORE THE THIRD DISTRICT, SECTION III SUBCOMMITTEE
OF THE VIRGINIA STATE BAR

IN THE MATTERS OF
CHRISTOPHER CAMPBELL BOOBERG       VSB Docket Nos. 25-033-132527, 24-033-
132462, 25-033-133953, 25-033-133699,
and 25-033-133956

SUBCOMMITTEE DETERMINATION
(CERTIFICATION)

On July 30, 2025, a meeting in these matters was held before a duly convened Third

District, Section III Subcommittee consisting of Dennis Russell Kiker, Esq., Chair Presiding;

Adam Eaton Strauchler, Esq., Member; and Barbara S. Lanier, Lay Member.  Pursuant to Part 6,

Section IV, Paragraph 13-15.B.3 of the Rules of Supreme Court of Virginia, the Third District,

Section III Subcommittee of the Virginia State Bar hereby serves upon Christopher Campbell

Booberg ("Respondent") the following Certification:

I.      VSB Docket Number 25-033-132527 and 24-033-132462
        Complainants:  Melissa Geigel and Jose Rodriguez, respectively

      A.    Allegations of Fact

1.    Respondent was admitted to the Virginia State Bar ("VSB") in 1994.  At all relevant

      times, Respondent was a member of the VSB.

2.    Melissa Geigel and Jose Rodriguez were involved in the same car accident in January

      2022.  Rodriguez is Geigel's uncle.  On January 20, 2022, Rodriguez retained

      Respondent to represent him on a contingency fee basis in filing a claim against Liberty

      Mutual as a result of the car accident.   On March 15, 2022, Geigel did the same.

3.    In January 2024, Geigel accepted a $20,000 settlement offer and Rodriguez accepted a $29,831 settlement offer.  Respondent told Geigel she would receive payment in about two weeks.

4.    On January 18, 2024, Respondent wrote to Liberty Mutual on behalf of both Geigel and Rodriguez to confirm acceptance of the settlement offers.  Respondent also faxed releases signed by Geigel and Rodriguez to Liberty Mutual the same day.  Respondent did not receive a response from Liberty Mutual, or checks, but marked the cases closed in his case management system.

5.    Following the acceptance of the settlement offer, Rodriguez began having problems getting in touch with Respondent.

6.    By May of 2024, Geigel had not received any settlement funds and began attempting to reach Respondent by phone, text and email.  Geigel tried to get information by going to Respondent's office, but she used the address on Respondent's website, which was no longer accurate.

7.    On June 26, 2024, Rodriguez submitted his bar complaint which stated "stolen my money of my auto accident."  Rodriguez had not heard from Respondent in three months when he filed his bar complaint.

8.    Having also had no success reaching Respondent, on July 2, 2024, Geigel filed her bar complaint.

9.    After receiving the bar complaint, Respondent contacted Liberty Mutual by emails dated July 25 and 29, 2024 to inquire if the checks had been mailed.  Liberty Mutual advised Respondent the checks had not yet been mailed at that time.

10. The Rodriguez and Geigel settlement checks were first mailed to Respondent by Liberty Mutual on August 5, 2024.

11. On or around August 13, 2024, Geigel received settlement proceeds in the amount of $16,611.76 via check from Respondent.

12. On August 14, 2024, Respondent wired Rodriguez his portion of the settlement funds totaling $13,160.76, after medical liens.

B. Nature of Misconduct

Such conduct by Respondent constitutes misconduct in violation of the following provisions of the Rules of Professional Conduct[1]:

*By failing to follow-up on or take any action regarding the Geigel and Rodriguez settlement proceeds between January and August 2024, Respondent failed to act with reasonable diligence and promptness in his representation of Geigel and Rodriguez, and violated Rule 1.3(a) as set forth below:*

**RULE 1.3    Diligence**

(a) A lawyer shall act with reasonable diligence and promptness in representing a client.

*By failing to communicate with Geigel and Rodriguez at all between January and August 2024, and by failing to respond to their calls, texts and emails, Respondent violated Rule 1.4(a) as set forth below:*

**RULE 1.4    Communication**

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

---

[1] Italicized language is explanatory and is not intended to limit the findings of the tribunal.

3

II.      VSB Docket Number 25-033-133699
         Complainant: Jonathan Baldwin

         A.      Allegations of Fact

13.    Respondent was admitted to the Virginia State Bar ("VSB") in 1994.  At all relevant

       times, Respondent was a member of the VSB.

14.    Jonathan Baldwin was involved in a car accident on January 3, 2022.

15.    On September 11, 2022, Baldwin retained Respondent to represent him in making a

       personal injury claim related to his car accident on a contingency fee basis.

16.    On October 5, 2022, Respondent requested Baldwin's medical records from Kenner

       Army Health Clinic ("Kenner").  Respondent followed up with Kenner on December 27,

       2022.

17.    In January 2023, Baldwin emailed Respondent that he had completed treatment.  On or

       about January 30, 2023, Respondent set up a task in his case management software for

       his assistant, Javier, to obtain all bills and records.

18.    On August 10, 2023, Baldwin emailed Respondent seeking an update on his case.  There

       is no evidence that Respondent responded to the email, but in August 2023, Respondent

       and Baldwin met in person at Respondent's office.

19.    Baldwin emailed Respondent on January 2, 2024:

       I hope you enjoyed your holiday season.  I'm hoping at this point we're close to
       wrapping things up.  At your earliest convenience can you please reach out to me.
       Thank you.

20.    On January 3, 2024, the statute of limitations on Baldwin's claim related to his car

       accident expired.  Respondent failed to file a lawsuit on behalf of Baldwin by this date.

21.    During his interview with the bar's investigator, Respondent was asked specifically how

       he missed the statute of limitations.  Respondent stated that he calculates the statute of

                                          4

limitations in each case when the case is opened. He further stated that his case management system includes an "SOL due date" which provides email reminders to Respondent and the assigned assistant as it approaches. Respondent could not offer any explanation as to how he missed the Baldwin statute of limitations.[2]

22.    On January 4, 2024, Baldwin tried to reach Respondent via the chat feature on Respondent's website. Baldwin wrote: "I've been trying to reach Chris regarding a settlement he's been working on for some time now. Last time we spoke was when I visited his new office location months ago. Can you please try to contact him so he can contact me. It's been 2 years now since my accident and no word on where we are with settling. My name is Jonathan Baldwin." Baldwin did not receive a response.

23.    On January 19, 2024, Baldwin again tried to reach Respondent via the chat feature on Respondent's website. Baldwin wrote: "I'm an existing client and I haven't heard from Chris for some time now. The last time I was on this chat line was on the 4th of this month and Amanda, at the time, ensured me she was going to notify him so he could contact me to give me an update. My name is Jonathan Baldwin. How soon can I expect to hear from him?" Baldwin did not receive a response.

24.    On May 19, 2024, Baldwin emailed Respondent, stating "I will be contacting you this week coming up."

25.    Respondent responded the same day, May 19, 2024, stating: "What's a good time and day for you?"

---

[2] There is a September 13, 2022 entry posted in Respondent's case management system that states, "Set Statute of Limitations in Facts Section." There is no indication that any statute of limitations was computed or entered into the system for Baldwin's case.

26.    Baldwin replied the next day, May 20, 2024, stating: "Is Wednesday at 4 PM?"

Respondent did not respond.

27.    On July 2, 2024, Baldwin emailed Respondent:

Considering how much time has passed since I asked you to represent me, you must admit I have been more than understanding and patient. The most troubling part about this ordeal is the lack of communication, or lack of attempt to communicate your progress of this case. I often feel there is a certain amount of avoidance on your part, which create doubt and suspicion about your firm. It would be hard to believe if you tell me that you are still waiting on Tricare to send you information before you can proceed. I don't want to use time as a factor if it is not necessary. As a retiree, integrity is extremely important to me, and I want to trust you are using it as well. I feel like I need to find a way to contact Progressive, but I keep holding off (for now). I looked over the agreement I signed so I want to give you the opportunity to do what you must do to get a fair settlement.

The frustration and stress knowing that this is dragging on is just too much to deal with. When you have time to call me without trying to rush me off the phone because you are currently busy with something else, please do so.

28.    During his interview with the bar's investigator, Respondent stated that he recalled speaking with Baldwin on the phone a couple of times. Respondent did not recall receiving or responding to the July 2, 2024 email from Baldwin.

29.    On October 27, 2024, Baldwin filed his bar complaint.

30.    Respondent acknowledged in his response to the bar complaint that he should have been more communicative with Baldwin. Respondent also acknowledged that the statute of limitations on Baldwin's claim expired in January 2024, and Respondent did not realize it had expired until he sat down to prepare his response to the bar complaint in December 2024.

B. <u>Nature of Misconduct</u>

Such conduct by Respondent constitutes misconduct in violation of the following

provisions of the Rules of Professional Conduct[3]:

*By failing to file Baldwin's claim before the statute of limitations expired, failing to realize for ten months that he missed the statute of limitations and by otherwise abandoning Baldwin and his claim, Respondent failed to act with reasonable diligence in his representation of Baldwin, and violated Rule 1.3(a) as set forth below:*

**RULE 1.3     Diligence**

    (a) A lawyer shall act with reasonable diligence and promptness in representing a client.

*By failing to update Baldwin on the status of his case in 2023 and 2024, and by failing to respond to Baldwin's emails, calls and chat messages, Respondent violated Rule 1.4(a) as set forth below:*

**RULE 1.4     Communication**

    (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

III.     <u>VSB Docket Number 25-033-133956</u>
        <u>Complainant: Jennifer Parrish</u>

A. <u>Allegations of Fact</u>

31.     Respondent was admitted to the Virginia State Bar ("VSB") in 1994.  At all relevant

times, Respondent was a member of the VSB.

32.     Jennifer L. Parrish represented Jose Chicas, who was insured by Erie Insurance, in

defense of a personal injury claim made by Saul Magana in connection with an August

16, 2022 car accident.

33.     Magana retained Respondent to represent him on September 27, 2022.

---

[3] Italicized language is explanatory and is not intended to limit the findings of the tribunal.

34.   On or about January 22, 2024, Respondent filed a warrant in debt against Chicas seeking
      $50,000.00 in damages on behalf of Magana in the General District Court of
      Spotsylvania County.

35.   On April 3, 2024, Respondent wrote to Erie to accept a $15,000.00 settlement offer on
      behalf of Magana.

36.   On April 9, 2024, Andrew Mullen, one of Parrish's colleagues, wrote to Respondent:

      > Enclosed please find Erie Insurance Exchange's check in the amount of $15,000.00 in
      > full and final settlement of the above-referenced matter.
      >
      > Also enclosed is a Release and Final Order. Please hold the settlement funds in escrow
      > until your client has signed the Release, you have endorsed the Final Order, and you have
      > returned both the Release and Final Order to me. Upon my receipt of the Final Order, I will
      > present it to the court for entry.

      A check payable to Saul Magana and Booberg Law in the amount of $15,000.00, an
      unexecuted release, and an unexecuted Final Order were enclosed with the April 9, 2024
      letter.

37.   On April 19, 2024, Respondent emailed his employees, Theresa Spain and Emilio
      Sanchez, stating:

      > Theresa and Emilio:
      >
      > Today, we received the check, release and dismissal order for Mr. Magana. I have scanned the order
      > and release separately from the rest of the mail to make them easier to find.\
      >
      > Theresa, I have signed the order, but the other attorney did not. Please mail it to opposing counsel with
      > an enclosed please find letter.
      >
      > Emilio, the release needs to be witnessed by a notary. Please arrange with Valerie to have it signed.
      >
      > Thanks
      >
      > **Christopher C Booberg**       📞 (804) 440-4000
      > Attorney                        📠 (804) 440-4400
      > Booberglaw                      🌐 https://www.booberglaw.com/
      >                                 ✉ chris@booberglaw.com
      >                                 📍 7 E Franklin St Richmond, VA 23219

38.   On April 22, 2024, the $15,000.00 check from Erie was deposited into Respondent's
      Wells Fargo IOLTA, with an account number ending in *2668.

8

39. On April 22, 2024, Andrew Mullen emailed Respondent: "I received the signed order from you, which we are submitting to the court, but we haven't received the release yet. Just reaching out to check on the status of that." That same day, Sanchez emailed Erie Insurance and copied Respondent stating: "Good afternoon Kacey, could you please help me sending me [sic] a copy of the release so we can finish this claim?"

40. Respondent stated that he did not realize that he did not have a signed release *until* he received the April 22, 2024 email from Andrew Mullen. Thus, on April 22, 2024 Respondent realized he did not have a signed release from Magana.

41. On or about May 9, 2024, Magana executed a settlement statement reflecting that he received $10,289.10 in distribution of settlement funds.

42. On June 6, 2024, Respondent wired $10,289.10 to Magana from Respondent's Wells Fargo IOLTA ending in *2668. Respondent stated he thought Magana had signed the release because he knew Sanchez had obtained Magana's banking information to do a wire transfer. Respondent did not check the file or inquire if his office had received a release signed by Magana prior to disbursing.

43. On July 22, 2024, Andrew Mullen emailed Respondent, "Following up about the signed release. Please send that to me as soon as possible." Respondent did not respond.

44. On October 3, 2024, Rebekah Alexander, another one of Parrish's colleagues, emailed Respondent, "Was your client able to sign the release for this case? I apologize if you already sent it to Andrew; he is no longer with us and we were switching software in the middle of him leaving, so it could have slipped through." Eleven minutes later, Respondent forwarded Alexander's email to another of his employees, Javier Suarez and

stated, "Can you help me with this?" Respondent did not respond to Alexander and did

not follow up with Suarez to see if he obtained a signed release.

45.   On October 8, 2024, Michele Dilger-Horne, another of Parrish's colleagues, emailed

Respondent: "I mailed you the final order and a release back in April. You sent back the

signed final order but we have never received the signed release. Another assistant

followed up with you while I was out on medical leave and I left a message again

yesterday. Please let us know when we can expect the signed release."

46.   On October 15, 2024, Parrish wrote Respondent:

> I am writing to follow up on your client's signed Release in this case. We
> have called and emailed you over the last two weeks and you have failed to
> respond to our inquiries. While the final order of dismissal was entered in this
> case on April 25, 2024, you have failed to provide the Release signed by your
> client. Attached is a copy of the April 9, 2024 letter from Mr. Mullen to you
> enclosing the Release, and asking that you hold the settlement funds in escrow
> until the Release had been signed by your client. If you have distributed those
> settlement funds, then we expect the Release should have been properly signed
> prior to any such distribution. Please send the Release to me by the beginning of
> next week, or contact me to discuss any issues relating to this. If we do not hear
> from you, we may need to take further action.

47.   On October 16, 2024, Respondent emailed his employee, Emilio Sanchez: "Please have

[Magana] sign this release ASAP. Steven can now help you with the notary part."

Respondent did not respond to Parrish and did not follow up with Sanchez to see if the

release had been signed.

48.   On November 26, 2024, Parrish filed her bar complaint.

49.   On November 29, 2024, Respondent emailed Parrish a copy of a release which was

executed by Magana and notarized on November 29, 2024, which was over five months

after Respondent distributed the settlement funds to Magana.

B. <u>Nature of Misconduct</u>

Such conduct by Respondent constitutes misconduct in violation of the following

provisions of the Rules of Professional Conduct[4]:

*By failing to obtain an executed release from Magana in a timely manner and by failing to respond to correspondence from opposing counsel regarding the release, Respondent failed to act with reasonable diligence and promptness in his representation of Magana, and violated Rule 1.3(a) as set forth below:*

**RULE 1.3    Diligence**

(a) A lawyer shall act with reasonable diligence and promptness in representing a client.

*By disbursing settlement funds to his client, Magana, without first obtaining a release from Magana, where those settlement funds were provided conditioned on Respondent obtaining an executed release from Magana prior to disbursement, Respondent disbursed the funds of a third party out of his trust account without authority, and violated Rule 1.15(b)(5) as set forth below:*

**RULE 1.15   Safekeeping Property**

(b) Specific Duties. A lawyer shall:
　　(5) not disburse funds or use property of a client or of a third party with a valid lien or assignment without their consent or convert funds or property of a client or third party, except as directed by a tribunal.[5]

IV.　　<u>VSB Docket Number 25-033-133953</u>
　　　　<u>Complainant: LaQuetta Everett</u>

A. <u>Allegations of Fact</u>

50.　Respondent was admitted to the Virginia State Bar ("VSB") in 1994.  At all relevant

times, Respondent was a member of the VSB.

---

[4] Italicized language is explanatory and is not intended to limit the findings of the tribunal.
[5] Rule 1.15(a)(1) requires that client and third-party funds held by a lawyer be deposited into a trust account.

11

51.  LaQuetta Everett retained Respondent to represent her in December 2022 in a personal injury claim on a contingency fee basis.

52.  On July 23, 2024, Respondent emailed Everett: "The insurance company has made a final settlement offer of $5,000.00.  I recommend that we accept it."

53.  On July 30, 2024, Respondent filed a warrant in debt on behalf of Everett in the Richmond City General District Court.[6]  Respondent stated he did not notify Everett of this filing.  He stated that he did it because he needed to preserve the statute of limitations and Everett was not responding to his communications about settlement, and he could not accept the settlement without her consent.

54.  On August 1, 2024, Everett responded "Good morning, I will accept.  Updated contact for me is 804-***-1725."  On August 1, 2024, Respondent replied "Thank you for letting me know. I will contact the insurance company.  We should have the money in about two weeks."

55.  On August 2, 2024, Respondent wrote to the insurance carrier, National General, accepting the settlement offer on behalf of Everett.

56.  On August 5, 2024, National General issued a check in the amount of $5,000.00 to Booberg Law, P.C. and Everett in satisfaction of Everett's claims.  On August 12, 2024, Respondent deposited the $5,000.00 in settlement funds into his Wells Fargo trust account ending in *2668.

57.  On August 23, 2024, Everett emailed Respondent "thank you for everything just wanted to know when the settlement will arrive?"

---

[6] As of the date of Respondent's interview, June 10, 2025, Respondent did not know the status of the case.

58.     On August 29, 2024, Everett emailed Respondent, "I will no longer be at the address on file as of Friday August 30 before sending the settlement can you let me know before its mailed to give an address."

59.     On September 9, 2024, Everett emailed Respondent "Contacting again about issuance of settlement, signed release document 8/16."

60.     On September 17, 2024, Everett again emailed Respondent "Afternoon, I am contacting on update on when settlement funds will be released to me."

61.     On September 30, 2024, Everett emailed Respondent "I have been attempting to reach you without any success for a few weeks now just wanted an update on settlement any information will be helpful, have a good day."

62.     Finally, on October 11, 2024, Everett emailed Respondent "I am making a final attempt to reach you regarding settlement not sure if you're still representing me but if you could contact me that would be great.  Have a good rest of your day!"

63.     Respondent did not respond to any of Everett's emails from August 23, 2024 through September 30, 2024.

64.     Everett also tried to call Respondent between in October 2024 with no response.  Everett had no contact at all with Respondent during that time period.

65.     On November 25, 2024, Everett filed her bar complaint.

66.     On December 31, 2024, Respondent emailed Everett in response to her email of October 11, 2024.  Respondent wrote: "I have been unable to reach you.  Please call me at 804-***-6257 when you have a chance."  The same day Everett responded "I did not receive a phone call or email from you since the last time we communicated in August.  I have

attempted to email you as well as call your office. I did email my updated contact information back in August as well."

67.     On January 10, 2025, Everett signed a settlement statement reflecting that she received $4,942.16 in settlement proceeds from Respondent. Everett confirmed that at or about the same time she also received a check in the amount of $4,942.16. Respondent waived any attorney's fees regarding the Everett representation.

68.     During the VSB's investigation of these matters, the VSB's investigator interviewed Kelly Wood, a physical therapist who owns Injury Treatment Center ("ITC") and who treated Rodriguez and Geigel after their car accident. Wood stated that she had repeatedly had problems getting paid on bills where her clients were represented by Booberg. She stated that she would learn from the clients that the cases had settled, but she had not been paid, so she would have to follow up with Booberg. She identified several instances where Booberg paid her twice for the same services and was unaware; she also identified instances in which she stated she was not paid but the client had received settlement proceeds. Examples include:

ITC Patient P.S.[7]

69.     According to Respondent's records, the settlement proceeds for ITC Patient P.S. ($25,000.00) were deposited into Respondent's trust account on March 11, 2024. On September 13, 2024, Respondent disbursed proceeds to ITC Patient P.S. in the amount of $9,250.34. On December 5, 2024, Respondent disbursed proceeds to ITC in the amount of $4,460.00. The remaining medical debts of ITC Patient P.S. due to CJW Hospital,

---

[77] Because these clients of Respondent did not file bar complaints, they are identified herein by their initials. By separate letter to Respondent's counsel, the names of the clients identified by their initials will be provided to Respondent.

Emergency Coverage, Richmond Ambulance, and Radiology Associates were not disbursed until June 2-3, 2025.

ITC Patients H.E. and N.E.

70.     ITC Patient H.E. owed ITC $1,200.00 for treatments received in connection with a personal injury, for which Respondent represented H.E. Respondent asked Wood to reduce the bill to $600.00 and Wood agreed. Wood received a check in the amount of $600.00, which was ripped when she received it and could not be cashed. Wood asked Respondent to provide a replacement check and he agreed. Wood received the replacement check three months later by courier to her home.

71.     ITC Patient N.E. was also a client of Respondent and had received treatments at ITC in connection with his personal injury, for which Respondent represented N.E. N.E. owed ITC $4,320.00 for his treatments. Respondent sent Wood Check No. 3131 in the amount of $1,140.00 with the name of N.E. in the memo line. However, when Wood received Check No. 3131 from Respondent, it was attached to an ITC invoice to H.E. in the amount of $1,140.00.

72.     Wood stated that she contacted Respondent about the confusion, and she later received from Respondent an additional check, also drawn on Respondent's trust account ending in *2668, Check No. 3006 dated July 30, 2024, in the amount of $3,000.00 and for the benefit of N.E.

73.     In April of 2025, Wood received from Respondent yet another check, in the amount of $4,320.00, with N.E.'s name in the memo line.

<u>Trust Accounting Violations</u>

74.     The VSB issued a subpoena duces tecum to Respondent in connection with its investigation of the Everett complaint. The subpoena required the production of Respondent's trust accounting records related to the Everett representation.

75.     While Respondent produced responsive documents on January 10, 2025, April 24, 2025 and June 4, 2025, no client ledger cards or receipts and disbursements journal were produced.

76.     During his interview with the VSB's investigator, Respondent admitted that he did not maintain client ledgers or a receipts and disbursements journal. Likewise, Respondent also stated he was not sure he had ever reconciled his trust account.

77.     The bar's investigator sought to determine whether Respondent's trust account had sufficient funds on deposit. However, without any of the underlying documentation (client ledgers or a receipts and disbursements journal), he was unable to determine what should be in Respondent's trust account.

78.     On January 23, 2025, the VSB issued a subpoena duces tecum to Wells Fargo Bank for the available bank records regarding Respondent's trust account ending in *2668, which were produced by Wells Fargo Bank on or about February 21, 2025.

79.     When the VSB's investigator reviewed the Wells Fargo records produced, he identified several additional clients of Respondent with apparent trust accounting irregularities:

<u>Client B.A.</u>

80.     Pursuant to his representation of Client B.A., Respondent received settlement funds in the amount of $30,000.00 on February 13, 2024, and $24,000.00 on or about April 23, 2025.

81.    On April 29, 2025, Respondent wired $26,637.71 in settlement proceeds to Client B.A. The settlement statement signed by Client B.A. in connection with the April 29, 2025 disbursement also identified the following debts of Client B.A, for which Respondent was withholding settlement funds:

| Booberg Law | $10,692.00 |
| The Goldwater Firm | $7,128.00 |
| Alliance Physical Therapy | $4,356.00 |
| Vandana Sharma MD | $1,650.00 |
| Washington Orthopedic & Spine Inst | $1,896.00 |
| Inova Emergency Room | $1,246.00 |

82.    By Check No. 3302, dated May 5, 2025, and drawn on Respondent's trust account ending in *2668, Respondent paid himself $17,820.00 in attorney's fees related to his representation of Client B.A.  The $17,820.00 included the $10,692.00 due to Respondent, in addition to the $7,128.00 due to The Goldwater Firm.

83.    Respondent realized the error in preparation for his interview with the VSB's investigator, because the VSB's investigator advised Respondent's counsel in advance of the interview that he would like to discuss Respondent's accounting for Client B.A.

84.    During his interview with the VSB's investigator, Respondent stated that he accidentally paid himself all of the attorney's fees, including those due to The Goldwater Firm.

85.    By Check No. 4071 and dated June 3, 2025, drawn on Respondent's operating account, Respondent paid The Goldwater Firm $7,128.00 in attorney's fees for the Client B.A. representation.

86.    In addition, the Wells Fargo records from Respondent's trust account reflect that Respondent paid Innova ER twice, both times from his trust account ending in *2668. On or about May 16, 2025, Check No. 3331 drawn on Respondent's trust account was issued payable to Inova Emergency Room in the amount of $1,246.00 for the benefit of

17

Client B.A. In addition, on or about June 24, 2025, Check No. 3521 drawn on Respondent's trust account ending in *2668 was negotiated payable to Inova ER in the amount of $1,246.00 for the benefit of Client B.A.

87.  Respondent also negotiated checks payable to the following additional medical providers for the benefit of Client B.A. from Respondent's trust account, which were not identified on the settlement statement signed by Client B.A.: Radiology Associates in the amount of $604.00 and Quest Diagnostics in the amount of $789.36.

ITC Patient P.S.

88.  Pursuant to his representation of ITC Patient P.S., Respondent received settlement funds in the amount of $25,000.00 on March 8, 2024.

89.  During his interview with the VSB's investigator, Respondent stated he reduced his attorney's fees for ITC Patient P.S.'s representation from $8,250.00 to $4,000.00 on September 13, 2024. By check dated September 22, 2024 and drawn on Respondent's trust account, Check No. 3082, Respondent paid himself $4,000.00 in attorney's fees for the ITC Patient P.S. representation.

90.  By check dated June 3, 2025 and drawn on Respondent's trust account, Check No. 3354, Respondent again paid himself $4,000.00 in attorney's fees for the ITC Patient P.S., for a total of $8,000.00.

91.  Respondent apologized during his interview with the VSB's investigator and stated that he would reimburse his trust account from his operating account and provide the VSB with a copy of that check. However, as of this subcommittee's meeting, Respondent had failed to provide the VSB any evidence or indication he has done so.

Client P.O.Z.

92.    Pursuant to his representation of Client P.O.Z., Respondent received settlement funds in the amount of $70,958.00, which were deposited into his trust account ending in *2668 on May 16, 2024. Client P.O.Z. signed a settlement statement on May 22, 2024, which reflected that $42,592.42 would be disbursed to Client P.O.Z. Respondent attempted to wire $42,592.42 to Client P.O.Z. on May 24, 2024, but the wire was unsuccessful because Client P.O.Z.'s bank did not accept wire transfers. On June 6, 2024, Respondent successfully wired Client P.O.Z. his $42,592.42 in settlement funds into a different bank account.

93.    Respondent did not move his earned fees associated with his representation of Client P.O.Z. out of his trust account until June 3, 2025, which was more than one year after the funds were received and Client P.O.Z. signed the settlement statement.

94.    When asked why, Respondent replied "incompetence."

95.    At the time of the VSB's investigator's interview, the balance in Respondent's trust account ending in *2668 was $758,356.14. Respondent advised the VSB's investigator during his interview that he believed approximately one-third of that balance was Respondent's earned fees.

Client E.F.B.

96.    Pursuant to his representation of Client E.F.B., Respondent received settlement funds in the amount of $30,000.00, which he deposited in his trust account ending in *2668 on October 10, 2024.

97.    Respondent's attorney's fees for the Client E.F.B. representation were $5,940.00 according to the settlement statement signed by Client E.F.B. on October 23, 2024.

19

98.    By Check No. 3110, dated October 23, 2024 and drawn on Respondent's trust account ending in *2668, Respondent paid himself $5,940.00 in attorney's fees for the Client E.F.B. representation.

99.    By Check No. 3136, dated December 30, 2024 and drawn on Respondent's trust account ending in *2668, Respondent again paid himself $5,940.00 in attorney's fees for the Client E.F.B. representation, for a total of $11,880.00.

100.   Respondent did not realize he paid himself twice for the Client E.F.B. representation until his interview with the VSB's investigator.  Respondent stated he did not know why it happened and that he would reimburse his trust account from his operating account and provide the VSB with a copy of that check.  However, as of this subcommittee's meeting, Respondent has failed to provide the VSB any evidence or indication he has done so.

Client A.P.

101.   Pursuant to his representation of Client A.P., Respondent received settlement funds in the amount of $65,000.00, which he deposited into his trust account ending in *2668 on June 6, 2024.

102.   According to the settlement statement signed by Client A.P. on October 4, 2024, Respondent's attorney's fees for the Client A.P. representation were $12,870.00.

103.   By Check No. 3098 dated October 7, 2024 and drawn on Respondent's trust account ending in *2668, Respondent paid himself $12,870.00 in attorney's fees for the Client A.P. representation.

104.   By Check No. 3100 dated October 7, 2024 and drawn on Respondent's trust account

ending in *2668, Respondent again paid himself $12,870.00 in attorney's fees for the

Client A.P. representation, for a total of $25,740.00.[8]

105.   Respondent did not realize he paid himself twice for the Client A.P. representation until

his interview with the VSB's investigator.  Respondent stated that he would reimburse his

trust account from his operating account and provide the VSB with a copy of that check.

Respondent later provided the VSB with a copy of Check No. 4081 dated June 19, 2025,

drawn on his non-trust account and payable to Booberg Law.  Respondent also provided

the VSB with a June 19, 2025 email from Wells Fargo Bank that reflected that

$12,870.00 would be credited to his trust account ending in *2668 on June 20, 2025.

106.   Disbursements for Client A.P.'s medical debts to Radiology Associates and ER

Physicians that were identified on Client A.P.'s October 4, 2024 settlement statement

were not made by Respondent until June 3, 2025.  During his interview with the VSB's

investigator, Respondent was asked why these disbursements were delayed.

Respondent's only explanation was that it was because the checks weren't written.

   B.  Nature of Misconduct

   Such conduct by Respondent constitutes misconduct in violation of the following

provisions of the Rules of Professional Conduct[9]:

   *By failing to respond to Everett in August, September and October 2024, by failing to
   promptly disburse Everett's settlement proceeds to Everett, and by failing to promptly disburse
   settlement funds to lien-holders in his representation of Everett, ITC Patient P.S., ITC Patient
   H.E., ITC Patient N.E., Client B.A., Client E.F.B. and Client A.P., Respondent failed to act with*

---

[8] Respondent also negotiated Check No. 3097 dated October 4, 2024 and drawn on his trust
account ending in *2668 in the amount of $12,870.00 and deposited it into his same trust account
ending in *2668 in connection with the Client A.P. representation.  It is not clear what purpose
Check No. 3097 served.

[9] Italicized language is explanatory and is not intended to limit the findings of the tribunal.

*reasonable diligence and promptness and violated Rule 1.3(a) as set forth below:*

**RULE 1.3     Diligence**

(a) A lawyer shall act with reasonable diligence and promptness in representing a client.

*By failing to communicate with Everett at all between August 23, 2024 and September 30, 2024, and by failing to return Everett's emails and calls in October 2024, Respondent failed to keep Everett reasonably informed about the status of her matter, and violated Rule 1.4(a) as set forth below:*

**RULE 1.4     Communication**

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

*By repeatedly failing to disburse earned fees from his trust account ending in \*2668 in a timely manner, maintaining what Respondent believes to be approximately $250,000.00 in Respondent's funds in his trust account, and by disbursing his earned attorney's fees twice for his representation of Client E.F.B., Client A.P. and ITC Patient P.S., Respondent commingled his own funds with his clients' funds in his trust account in violation of Rule 1.15(a)(3) as set forth below:*

**RULE 1.15   Safekeeping Property**

(a) Depositing Funds.

(3) No funds belonging to the lawyer or law firm shall be deposited or maintained therein except as follows:
(i) funds reasonably sufficient to pay service or other charges or fees imposed by the financial institution or to maintain a required minimum balance to avoid the imposition of service fees, provided the funds deposited are no more than necessary to do so; or
(ii) funds in which two or more persons (one of whom may be the lawyer) claim an interest shall be held in the trust account until the dispute is resolved and there is an accounting and severance of their interests. Any portion finally determined to belong to the lawyer or law firm shall be withdrawn promptly from the trust account.

*By failing to maintain complete records of the disbursements made for the benefit of ITC Patient P.S., ITC Patient H.E., ITC Patient N.E., Client B.A., Client E.F.B. and Client A.P., and properties maintained in his possession for the benefit of those same clients, Respondent violated*

*Rule 1.15(b)(3) as set forth below:*

**RULE 1.15   Safekeeping Property**

> (b) <u>Specific Duties.</u> A lawyer shall:
> (3) maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accountings to the client regarding them[.]

*By failing to timely and promptly disburse funds to third party lien-holders for the benefit of Everett, ITC Patient P.S., ITC Patient H.E., ITC Patient N.E., Client B.A., Client E.F.B. and Client A.P., Respondent violated Rule 1.15(b)(4) as set forth below:*

**RULE 1.15   Safekeeping Property**

> (b) <u>Specific Duties.</u> A lawyer shall:
> (4) promptly pay or deliver to the client or another as requested by such person the funds, securities, or other properties in the possession of the lawyer that such person is entitled to receive[.]

*By failing to maintain a receipts and disbursements journal for his trust account ending in \*2668, Respondent violated Rule 1.15(c)(1) as set forth below:*

**RULE 1.15   Safekeeping Property**

> (c) Record-Keeping Requirements. A lawyer shall, at a minimum, maintain the following books and records demonstrating compliance with this Rule:
> (1) Receipts and disbursements journals for each trust account. These journals shall include, at a minimum: identification of the client or matter; date and amount of the transaction; name of the payor or payee; manner in which the funds were received, disbursed, or transferred; and current balance. A checkbook or transaction register may be used in lieu of separate receipts and disbursements journals as long as the above information is included.

*By failing to maintain client ledgers for his trust account generally, and specifically for failing to maintain a client ledger related to his representation of Everett, Respondent violated Rule 1.15(c)(2) as set forth below:*

**RULE 1.15   Safekeeping Property**

> (c) Record-Keeping Requirements. A lawyer shall, at a minimum, maintain the following books and records demonstrating compliance with this Rule:
> (2) A client ledger with a separate record for each client, other person, or entity from whom money has been received in trust. Each entry shall include, at a minimum: identification of the client or matter; date and amount of the transaction; name of the

payor or payee; source of funds received or purpose of the disbursement; and current balance.

*By failing to reconcile his trust accounting records, Respondent violated Rule 1.15(d)(3) as set forth below:*

**RULE 1.15   Safekeeping Property**

(d) Required Trust Accounting Procedures. In addition to the requirements set forth in Rule 1.15 (a) through (c), the following minimum trust accounting procedures are applicable to all trust accounts.

(3)  The following reconciliations must be made monthly and approved by a lawyer in the law firm:
(i) reconciliation of the client ledger balance for each client, other person, or entity on whose behalf money is held in trust;
(ii) reconciliation of the trust account balance, adjusting the ending bank statement balance by adding any deposits not shown on the statement and subtracting any checks or disbursements not shown on the statement. This adjusted balance must equal the balance in the checkbook or transaction register; and
(iii) reconciliation of the trust account balance ((d)(3)(ii)) and the client ledger balance ((d)(3)(i)). The trust account balance must equal the client ledger balance.

## V.    CERTIFICATION

Accordingly, it is the decision of the Subcommittee to certify the above matter to the

Virginia State Bar Disciplinary Board.

THIRD DISTRICT, SECTION III SUBCOMMITTEE
OF THE VIRGINIA STATE BAR

By _____
Dennis Russell Kiker
Subcommittee Chair

24

<u>CERTIFICATE OF SERVICE</u>

I certify that on __8/19/2025__, I caused a true and correct copy of the foregoing Subcommittee Determination (Certification) to be sent to Christopher Campbell Booberg, Respondent, by certified mail and first-class mail at BoobergLaw, P.C. 406 West Franklin Street, Richmond, Virginia 23220, Respondent's last address of record with the Virginia State Bar, and by email to chris@booberglaw.com; and to Paulo Emilio Franco, Jr., Respondent's counsel, by first-class mail at Thompson McMullan, P.C. 100 Shockoe Slip 3rd Floor, Richmond, Virginia 23219, and by email to pfranco@t-mlaw.com.

Shelley L. Spalding
Assistant Bar Counsel

25



*Thompson* McMullan P.C.

A T T O R N E Y S   A T   L A W

100 Shockoe Slip, Richmond, Virginia 23219-4140
*Telephone:* 804.649.7545     *Facsimile:* 804.780.1813
*Website:* www.t-mlaw.com



Paulo E. Franco, Jr.
Direct Dial: (804) 698-6244
Facsimile: (804) 780-1813
Email: pfranco@t-mlaw.com
Website: www.t-mlaw.com

November 18, 2025

**VIA HAND DELIVERY AND EMAIL**
clerk@vsb.org

Joann Fronfelter, Clerk
Virginia State Bar Disciplinary System
1111 East Main Street, 7th Floor
Richmond, Virginia 23219

Re:     **In the Matters of Christopher Campbell Booberg**
        **VSB Docket No. 24-033-132462**
        **VSB Docket No. 24-033-132527**
        **VSB Docket No. 25-033-133699**
        **VSB Docket No. 25-033-133953**
        **VSB Docket No. 25-033-133956**

Dear Jo:

Pursuant to Part 6, Section IV, Paragraph 13-28 of the Rules of the Supreme Court of Virginia, please find enclosed an original Affidavit of Consent to Revocation that has been signed by Mr. Booberg and duly notarized. I understand from Ms. Spalding's email of yesterday that the Office of Bar Counsel has no objection to this Affidavit.



If you require anything further, please do not hesitate to contact me.

Very truly yours,

Paulo E. Franco, Jr.

PEFjr
Enclosure

Cc:      (By Email w/enclosure)
         Shelley L. Spalding, Assistant Bar Counsel
         Christopher C. Booberg, Esq.
         William W. Tunner, Esq.